504 So.2d 1188 (1987)
Sam H. BROWN, Mrs. Winona Brown, United States Fidelity and Guaranty Company and B.A. Jones Casing Crews, Inc.
v.
R.E. WILLIAMS, d/b/a R.E. Williams Drilling Company, P.E. Cochran, Phil E. Vasser & El Toro Production Company, Inc., et al.
No. 56322.
Supreme Court of Mississippi.
February 11, 1987.
Rehearing Denied April 22, 1987.
*1189 R.L. Netterville, Everette Truly, Adams, Forman, Truly, Ward, Smith & Bramlette, Natchez, for appellants.
J. Price Coleman, Jonathan B. Fairbank, Daniel, Coker, Horton & Bell, Jackson, John Mulhearn, L.C. Gwin, Jr., Fitzpatrick, Gwin, Lewis, Punches & Hudson, Natchez, Cary E. Bufkin, K. Hayes Callicutt, Shell, Buford, Bufkin, Callicutt & Perry, Jackson, for appellees.
Before ROY NOBLE LEE, P.J., and PRATHER and ANDERSON, JJ.
ROY NOBLE LEE, Presiding Justice, for the Court:
Sam H. Brown and Winona Brown, husband and wife, filed suit in the Chancery Court of Adams County, Mississippi, (attachment in chancery) against R.E. Williams, d/b/a R.E. Williams Drilling Company (Williams), P.E. Cochran, R.R. (Bob) Pevey, and H.W. McFarland, employees of Williams, B.J. Hughes, Inc., and Hughes Tool Company, for personal injuries sustained by Sam H. Brown while setting casing on an oil well being drilled by Williams. B.A. Jones Casing Crews, Inc., (Jones) employer of Brown, and United States Fidelity & Guaranty Company, workers' compensation carrier for Jones, intervened in this suit, seeking reimbursement for workers' compensation benefits paid. The lower court entered judgment for the defendants and the complainants have appealed to this Court.[1]
The discussion in this case will be divided into two parts. The first part relates to B.J. Hughes, Inc., which was made a party under the theory of products liability, since it manufactured the equipment/tool involved. The second part relates to R.E. Williams, d/b/a R.E. Williams Drilling Company, and R.R. (Bob) Pevey, and deals with the charge of negligence on their parts and whether they are immune from liability under the Mississippi Workers' Compensation Law.

I.
The appellants charged in the bill of complaint, which was filed prior to the adoption of the Mississippi Rules of Civil Procedure, grounds for the action against Hughes to be (1) negligence in design of the equipment/tool, (2) negligence in failing to test and inspect the equipment, (3) negligence in failing to warn Brown, and (4) breach of expressed and implied warranties. For the purpose of this discussion, we view the complaint as having charged a products liability violation against Hughes.
On September 15, 1976, Williams was drilling an oil well in Catahoula Parrish, Louisiana, under a contract with one Paul Byrne, operator of the well. Pevey was the tool pusher or overall supervisor of the drilling operations. Pevey called B.A. Jones Casing Crews, Inc. and requested a casing crew to set the casing pipe of the well. That work was a special type work performed by specialists in the field, such as Jones. Appellant Brown was the crew pusher in one of Jones' casing crews, and he and his crew arrived at the drilling site that day to perform the specialized task of setting casing.
*1190 A piece of equipment called an elevator was used in the process of setting casing for the purpose of clamping, lifting, hoisting and setting joints of casing in the drill hole. Appellant Brown tried to rent one of Jones' elevators to Williams for the purpose of the operation, but Williams had an elevator of its own, and Pevey directed appellant Brown to use that elevator.
Two methods of setting[2] casing are commonly used in a drilling operation such as here, i.e., the one-step method and the two-step method. Brown, as crew pusher, was instructed by Pevey to rig the elevator and use the one-step method of running the casing. A necessary piece of equipment in both operations is an elevator, which clamps around the casing joint, then it latches and is used to elevate or lift the casing to a position in place where the casing is guided into the drill hole and fastened to another joint or casing.
Appellant Brown and his crew began the task of setting the casing. The elevator was clamped around the casing joint and Brown closed the latch. The casing was then hoisted above Brown, the latch came loose, and the joint of casing fell upon Brown, seriously injuring him.
A. THE COURT WAS MANIFESTLY IN ERROR AS A MATTER OF LAW IN APPLYING THE LAW OF NEGLIGENCE AND NOT "STRICT LIABILITY." THE LAW APPLICABLE TO THIS CASE IS "STRICT LIABILITY."
B. THE COURT WAS MANIFESTLY IN ERROR IN ITS FINDING OF FACTS IN THAT THE CONCLUSIVE AND UNCONTRADICTED FACTS PROVED LIABILITY ON HUGHES UNDER STRICT LIABILITY IN TORT.
C. THE COURT MISCONSTRUED HUGHES' DUTY WITH RESPECT TO DESIGN LIABILITY.
Evidence for the appellees reflects that the equipment/tool, hereinafter referred to as elevator, was designed and manufactured by Hughes and had been in use for a period of twenty-eight (28) years and five (5) months prior to the accident. Hughes had never been called upon to repair or do any work on the elevator since it had left that company.
R.C. Johnson, vice president of engineering for Hughes and an expert in the field, testified that the type of elevator involved here was manufactured between 1922 to 1925 until 1975, when it was taken off the market and replaced with another line of elevators of higher capacity as far as weight is concerned; that there was nothing wrong with the elevator and its design; that there were no functional complaints of any sort against that type elevator during the years it was manufactured and used; that the company had never had any report of a door latch opening, as here; that neither Hughes nor any of its competitors before 1948 and 1976 had any safety chains on their elevator latches; that the elevator in this case without a safety chain was reasonably safe for its intended use; that once the latch is latched there is no load trying to push the latch off; that the casing could not have fallen out of the elevator if the latch had been latched; and that Brown and the casing crew failed to properly latch the door, which resulted in the door falling open.
Johnson further testified that, if the latch on the elevator was loose on the day of the accident, if the spring was weak, if the elevator was rusty, and if the elevator appeared to be worn out, the elevator was not in the same condition as when Hughes sold the elevator and when it left Hughes' plant; that the elevator, which was introduced in evidence and was in the courtroom, was not in the same condition as when Hughes manufactured and sold it. Witnesses with experience in oil field drilling testified and corroborated much of the testimony of Johnson.
Appellant Brown testified that he used the elevator and the one-step method because Pevey instructed him to do it that way and that the directions that Pevey gave caused the accident to happen; that the elevator was not safe; that the spring *1191 felt loose on the latch; that the elevator did not have a safety chain on it; that the elevator was rusty and looked like it was worn out; and that elevators have to be repaired at times by putting new springs and new pins in them. Appellant Brown produced lay witnesses and two expert witnesses on the issue that the elevator was defectively designed and manufactured and negligently used by Williams.
The chancellor made the following findings from the evidence:
It is obvious that the only evidence touching on conformity of the elevator to practices of other manufacturers in the industry in 1948 was the testimony of H.A. Johnson. He testified that at the time of the manufacture that safety latches and safety chains were not utilized. The Court further finds that elevators generally used in the Mississippi-Louisiana Wilcox area, even at the time of the injury, did not have safety chains or safety latches, although some elevators in other areas did from time to time, even though not as a general rule, use safety latches.
The elevator which was used on the rig at the time of the accident and which was in evidence is a simple mechanism or apparatus, and the testimony was and the Court so finds that the spring was in good condition at the time the Court inspected it at time of trial; but, more importantly, the spring and the replacement thereof was a matter of maintenance of the elevator from time to time by the user and failure of the spring to operate would be an open and obvious danger and certainly not hidden.
The Court finds that there was no negligence in design, no negligence in failure to test and inspect, no negligence in failure to warn, and finds no breach of any expressed or implied warranty.
The Court finds that the elevator conformed to the state of the art in design and standards of other manufacturers in the industry as of the date of its manufacture in 1948. It is immaterial that subsequent elevators may have had safety latches. See Fincher v. Ford Motor Company, 399 F. Supp. 106 (S.D.Miss. 1975).
As to the duty to warn a purchaser of a dangerous design which is open and obvious, see Harrist v. Spencer-Harris Tool Co. [244 Miss. 84], 140 So.2d 558 (Miss. 1962). Certainly any dangerous defect in the elevator would have been obvious and open to Complainant Sam H. Brown in view of his experience in the oilfield as brought out by his own testimony.
The appellants contend that the lower court was manifestly in error in applying the law of negligence and not strict liability and was manifestly in error in its finding of facts because the conclusive and uncontradicted evidence proved liability on Hughes under strict liability in tort. From the brief reference to the controverted facts in this case, it is obvious the evidence is not uncontradicted or conclusive, but was strong in support of the Hughes defense. If a chancellor arrives at the correct conclusion without making a finding of fact on particular issues, this Court will assume that he made determinations of fact and his judgment will not be overruled. Rives v. Peterson, 493 So.2d 316, 317 (Miss. 1986); Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985); Dungan v. Dick Moore, Inc., 463 So.2d 1094 (Miss. 1985); Cotton v. McConnell, 435 So.2d 683 (Miss. 1983).
This state followed the principle of strict liability in tort in State Stove Mfg. Co. v. Hodges, 189 So.2d 113 (Miss. 1966), and adopted the language of § 402A of the Restatement (Second) Torts (1965). Section 402A requires proof of three elements in order to prevail:
(1) that the plaintiff was injured by the product,
(2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and
(3) that the defect existed at the time it left the hands of the manufacturer.
See Coca-Cola Bottling Co. v. Reeves, 486 So.2d 374, 378 (Miss. 1986); Toliver v. General Motors Corp., 482 So.2d 213, 216 (Miss. 1985); and Early-Gary, Inc. v. Walters, 294 So.2d 181, 186 (Miss. 1974).
*1192 In Toliver v. General Motors Corp., supra, the Court, in addressing the products liability claim arising by reason of design, said:
In a design case, just as in the case of a manufacturing defect, the plaintiff must show that the product was defective and that its defective condition made the product unreasonably dangerous to him. Comment g. to Section 402A defines defective condition as "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." In the context of fuel tank design, obviously the plaintiff contemplated that the automobile which he purchased had a fuel tank affixed to it, which could become dangerous under some circumstances. Therefore, in order to make out his prima facie case, he must show that the placement of the tank on the car that injured him was defective: that it fell below the standard of automotive design contemplated by the user, and, thus, became unreasonably dangerous to him.
482 So.2d at 218. Rose v. Mercury Marine, Division of Brunswick, 483 So.2d 1351, 1352 (Miss. 1986). See also Gray v. Manitowoc Co., Inc., 771 F.2d 866 (5th Cir.1985).
As stated above, this Court must affirm the chancellor on a finding of fact unless he is manifestly wrong on those facts. The books are replete with decisions setting forth that principle, and we stated it recently in Harkins v. Fletcher, 499 So.2d 773 (Miss. 1986), and Dillon v. Dillon, 498 So.2d 328 (Miss. 1986). We cannot say the chancellor was manifestly wrong in his finding of fact here and in his conclusions based upon the record before us.
D. HUGHES WAS LIABLE FOR FAILURE TO WARN.
E. THERE IS A POST-SALE DUTY TO DEVELOP AND SUPPLY CURATIVE DEVICES FOR RECOGNIZED, SERIOUS DANGERS IN MANUFACTURED PRODUCTS ALREADY ON PRODUCTION.
F. THE COURT ERRED IN HOLDING THAT PLAINTIFF ASSUMED THE RISK.
G. THE DEFENSE OF OPEN AND OBVIOUS DEFECT DOES NOT APPLY AND THE COURT WAS MANIFESTLY IN ERROR IN SO HOLDING.
In view of our opinion that the lower court was not manifestly wrong in holding against the appellants on the issues of liability, as to B.J. Hughes, Inc., the judgment is affirmed as to Hughes, and it is not necessary to discuss the remaining points relating to it.

II.
A. THE COURT WAS MANIFESTLY IN ERROR IN BOTH LAW AND FACT IN HOLDING THAT WILLIAMS WAS IMMUNE IN THIS THIRD-PARTY SUIT.
B. WILLIAMS WAS A PARTNER WITH BYRNE AND OTHER CO-OWNERS OF THE LEASE.
C. WILLIAMS IS NOT IMMUNE UNDER THE WORKMEN'S COMPENSATION ACT FROM SUIT BY PLAINTIFF.
The question of tort liability against Williams will be resolved by a determination of whether or not Williams is liable as an employer under the Mississippi Workers' Compensation Act, i.e., Mississippi Code Annotated § 71-3-7 (1972), rather than as a third party. Section 71-3-7 provides:
Every employer to whom this chapter applies shall be liable for and shall secure the payment to his employees of the compensation payable under its provisions.
In the case of an employer who is a subcontractor, the contractor shall be liable for and shall secure the payment of such compensation to employees of the subcontractor, unless the subcontractor has secured such payment.
On July 19, 1976, Paul Byrne, an independent promoter of oil and gas operations, sold and assigned unto Williams a one-fourth (1/4) royalty interest in oil, gas and minerals to be explored by the oil and gas well involved in this lawsuit. He *1193 also entered into an agreement with Williams for drilling the oil well. On September 27, 1976, Byrne billed Williams eighteen thousand dollars ($18,000) for his one-fourth interest in the well, which then was discovered to be dry. On September 29, 1976, Williams sent an invoice to Byrne in the amount of forty-one thousand seventy-three dollars thirty-two cents ($41,073.32) for drilling the well, and the obligations were paid and satisfied. Pertinent parts of the agreement between Byrne, as operator of the well, and Williams, as the drilling contractor, obligated Williams to:
Drill your above captioned well to a total depth of 6,500 feet furnishing the services, work and equipment listed below for the turnkey price of $6.00 per linear foot drilled.
1. Contractor will furnish road and location and towing of equipment limited to $500.00, including digging pit, backfilling pit, and leveling location.
2. Move in, rig up, and furnish all labor, fuel, water, bits and rig supplies necessary for the drilling of the hole.
3. Drill surface hole and furnish 8 5/8 inch surface casing, run and cement same, and furnish cement, services and rig time for this, all in accordance with the Mississippi State Oil and Gas Board.
The mere fact that Williams owned a 1/4 royalty interest in the oil, gas and minerals, which were sought by drilling the well, did not constitute Williams an owner similar to Mississippi Power & Light Company in Falls v. Mississippi Power & Light Co., 477 So.2d 254 (Miss. 1985), or Damson Oil Corporation in the case of Nash v. Damson Oil Corp., 480 So.2d 1095 (Miss. 1985), or a third party against whom a tort claim may be prosecuted. Williams contracted with Byrne to drill the well, and then Williams subcontracted with Jones Casing Company, employer of Sam Brown, to lay and set the casing in the well. Thus, Williams became subject to, and covered by, § 71-3-7, which imposed a statutory obligation on Williams, as general contractor, to insure that workers' compensation insurance was provided upon the employees of Jones, either by Jones or by Williams.
A consideration and understanding of Doubleday v. Boyd Construction Co., 418 So.2d 823 (Miss. 1982); Falls v. Mississippi Power & Light Co., supra; and Nash v. Damson Oil Co., supra; puts the question of third-party liability to rest insofar as it pertains to Williams.
In Doubleday, the Mississippi State Highway Department let a general contract for highway construction to Boyd Construction Company, the general or prime contractor. Boyd sublet a part of the construction work to W.T. Ratliff, Inc., who became the subcontractor. Boyd required, in the subcontract with Ratliff, that Ratliff secure workmen's compensation coverage to be carried for the protection of the subcontractor's employees, which benefits were paid to Doubleday as a result of personal injuries sustained when struck by an automobile while working on the construction job. Thus, Boyd Construction company was immune from a tort action by Doubleday, not because of the workmen's compensation coverage, but because the statute § 71-3-7 imposed the obligation on Boyd Construction Company to assure that compensation coverage was in effect on Ratliff's employees.
In Falls, Mississippi Power & Light Company was not a contractor in the sense that Boyd Construction Company was a general/prime contractor. Mississippi Power & Light was the company or owner/permittee. Damson Oil Corporation occupied the same position as company or owner/lessee. Mississippi Power & Light and Damson Oil Corporation were in the same status as the Mississippi State Highway Department in Doubleday. Neither Mississippi Power & Light Company nor Damson Oil Corporation sublet work to a subcontractor. Mississippi State Highway Department in Doubleday had no subcontractors. Therefore, Mississippi Power & Light Company and Damson Oil Corporation were not within, or covered by, § 71-3-7.[3]
*1194 In the case sub judice, Williams was not in the same position as Mississippi Power & Light Company and Damson Oil Corporation, but was in the position of Boyd Construction Company, general contractor, who subcontracted with W.T. Ratliff, Inc., employer of Doubleday, in Doubleday v. Boyd Construction Co., supra. Therefore, we conclude that since Williams was a general contractor in the drilling of the well on the Byrne lease, and Jones Casing Company was Williams' subcontractor for setting the casing, the statutory obligation imposed upon Williams rendered Williams immune to a third-party tort liability, and the lower court correctly entered judgment for Williams. R.R. (Bob) Pevey, being an employee of Williams, likewise is without liability. McCluskey v. Thompson, 363 So.2d 256 (Miss. 1978).
The judgments of the lower court are affirmed.
AFFIRMED.
WALKER, C.J., HAWKINS, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] P.E. Cochran, H.W. McFarland and Hughes Tool Company were discharged by the lower court at the conclusion of appellants' case and no appeal is made as to those defendants.
[2] Also referred to as "running casing."
[3] See concurring opinion of Justice Roy Noble Lee in Nash v. Damson Oil Corp., 480 So.2d at 1101.